El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
En esta ocasión tenemos otra oportunidad de aplicar a un pleito de daños y perjuicios un contrato de transacción mediante el cual se libera de toda responsabilidad a unos médicos que incurrieron en impericia. Nos corresponde de-terminar si el acuerdo también tuvo el efecto de liberar al único codemandado que no formó parte de su otorga-miento: el Hospital. Por entender, que el Tribunal de Ape-laciones erró al aplicar la doctrina de cosa juzgada, cuando solo correspondía poner en vigor el referido contrato, revocamos.
I
La Sra. Miriam N. Fonseca, la Sra. Rosa M. Fonseca y la Sra. Felicita Rodríguez (las demandantes) instaron una acción de daños y peijuicios por impericia médica en contra del Dr. Guillermo Tirado Menéndez, el Dr. Arnulfo Santana, el Sindicato de Aseguradores de Impericia Médica (S.I.M.E.D.), asegurador de los referidos médicos, y el Cen-tro Médico del Turabo Inc. h/n/c, HIMA San Pablo (HIMA), a raíz de la muerte de la Sra. Iris Fonseca. El foro primario declaró con lugar la demanda y responsabilizó solidaria-mente a los médicos demandados. No obstante, desestimó la reclamación contra HIMA, al concluir que las enferme-ras y el personal del Hospital siguieron las instrucciones *285 de los médicos, quienes no eran empleados de HIMA. Por último, calculó los daños y sufrimientos mentales de las demandantes en $370,000.
Inconformes, las demandantes solicitaron reconsidera-ción para que se le impusiera a HIMA responsabilidad so-lidaria con los médicos codemandados, al amparo de la doc-trina de autoridad aparente. En específico, recalcaron que la Sra. Iris Fonseca era originalmente paciente de otro hospital y que fue llevada a HIMA por ser el hospital más cercano. Por su parte, HIMA no compareció, a pesar de habérsele concedido un término para que se expresara. En consecuencia, el foro primario emitió una resolución en la que impuso responsabilidad solidaria a HIMA por las ac-tuaciones de los médicos autorizados a prestar servicios profesionales en dicha institución. HIMA no solicitó recon-sideración o revisión de este dictamen.
Luego de varios trámites procesales, en 2009, las de-mandantes llegaron a un Acuerdo Transaccional Privado con el doctor Tirado Menéndez, el doctor Santana y S.I.M.E.D. Mediante el acuerdo, estos codemandados fue-ron liberados de responsabilidad respecto a cualquier otro asunto relacionado con la muerte de la Sra. Iris Fonseca. La causa del contrato de transacción fue la cantidad límite de las pólizas de los referidos médicos, a saber, $350,000. En específico, el inciso seis (6) de este contrato establece que, con este pago, la parte demandante quedaba satisfe-cha “por cualquier obligación que pudiese imponerse a ellos por los daños alegados o no, que surjan del evento que propició la presentación de la demanda. Bajo ningún con-cepto, las partes comparecientes pagarán cantidad alguna adicional a las especificadas en este documento”. Apéndice del Certiorari, pág. 104.
Respecto al trámite ulterior contra HIMA, este acuerdo transaccional dispuso lo siguiente:
7. ... La parte demandante expresamente se reserva ínte-gramente el derecho de proseguir cualquier trámite post- *286 sentencia en contra del co-demandado HIMA, el cual queda en el pleito y no ha sido relevado de responsabilidad por este acuerdo ni podrá beneficiarse del mismo. Al presente acuerdo le será aplicable todo lo establecido en Szendrey Ramos v. Hospicare, Inc., 158 D.P.R. 648 (2003), 2003 T.S.P.R. 18, y en US Fire Insurance Company y otros v. Autoridad de Energía Eléctrica y otros, 17[4] D.P.R. [846] (2008), 2008 T.S.P.R. 160, a los fines de que el co-demandado HIMA, el cual queda en el pleito y contra quien prosiguen los trámites post-sentencia, no será responsable de forma alguna por los daños que pudieran ser atribuibles ay lo hayan sido causados por los co-demandados comparecientes. El co-demandado HIMA sólo responderá a la parte demandante por los daños causados por sus propias ac-ciones u omisiones negligentes, las acciones u omisiones negli-gentes de sus empleados y lo de aquellas personas por las cua-les deba responder bajo cualquier doctrina legal vigente en Puerto Rico, o por la participación que en su momento se es-tablezca compete a HIMA pagar según la sentencia emitida por el Tribunal de Primera Instancia. (Énfasis suplido.) Apén-dice del Certiorari, págs. 104 — 105.
Así las cosas, las demandantes llevaron a cabo gestiones extrajudiciales para requerir de HIMA el balance pen-diente de la sentencia del foro primario. Ante la negativa de pago, acudieron ante el Tribunal de Primera Instancia y solicitaron una orden de embargo en ejecución de sentencia en su contra.
Por su parte, HIMA se opuso a la solicitud de embargo y adujo que, aunque el foro de primera instancia le impuso responsabilidad solidaria junto a los médicos codemanda-dos, no fue cocausante de los daños que sufrieron las demandantes. Asimismo, señaló que, conforme a la cláu-sula siete (7) del contrato de transacción, las demandantes se reservaron el derecho de continuar contra HIMA única-mente por la propia negligencia de HIMA. Por lo tanto, alegó que no procedía el embargo en su contra, pues el foro sentenciador determinó que HIMA no fue negligente. Las demandantes se opusieron a las alegaciones de HIMA e invocaron nuevamente la doctrina de autoridad aparente. Asimismo, señalaron que la señora Fonseca llegó a HIMA a través de la Sala de Emergencias.
*287 Así las cosas, el 28 de octubre de 2009, el foro primario emitió una resolución en la que declaró sin lugar la solici-tud de embargo en contra de HIMA. Esta resolución re-saltó que los doctores demandados no eran empleados del hospital. Esto, pues el doctor Tirado Menéndez fue contra-tado por la corporación que administra la Sala de Emer-gencia de HIMA y el doctor Santana tenía privilegios para atender pacientes allí.
Además, recalcó que no se presentó evidencia en cuanto a si hubo o no supervisión de parte de los facultativos mé-dicos, empleados de HIMA, de esos médicos que resultaron responsables por impericia. Tampoco se presentó evidencia sobre actos previos de impericia profesional de esos doctores. Además, concluyó que HIMA no tenía responsa-bilidad porque sus empleados actuaron según las directri-ces de los doctores Tirado y Santana. Por ello, se denegó el embargo y cobro de lo reclamado a HIMA.
Inconformes, las demandantes acudieron ante el Tribunal de Apelaciones. Dicho foro concluyó que lo resuelto acerca de la responsabilidad solidaria del Hospital era cosa juzgada y no se podía alterar. Por ello, revocó la resolución del foro primario.
Tras haber solicitado reconsideración sin éxito, HIMA acude ante nos mediante recurso de apelación y solicita que revoquemos la decisión del foro intermedio. HIMA nos plantea que, aunque reconoce el efecto de la resolución emitida en el 2007, que le impone un deber de solidaridad junto a los codemandados, nunca se adjudicó un grado de culpa en su contra. Por lo tanto, al relevar a los médicos de su culpa mediante el acuerdo transaccional, las demandan-tes, a su vez, relevaron a HIMA de cualquier reclamación. En síntesis, HIMA no impugna la aplicación de la doctrina de cosa juzgada; solo nos solicita que reconozcamos que fue liberada mediante el acuerdo de transacción.
Examinado el recurso de apelación presentado por HIMA, decidimos acogerlo como certiorari y expedirlo. Ha-biendo comparecido ambas partes, procedemos a resolver.
*288 II
A. Responsabilidad de los hospitales para con los pacientes
Durante las últimas décadas hemos ido estableciendo distintas bases para imponerle responsabilidad a los hospitales por los daños que puedan sufrir los pacientes. Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 404—405 (1985); Hernández v. La Capital, 81 D.P.R. 1031, 1038 (1960). En primer lugar, concluimos que los hospitales responden por los actos u omisiones negligentes de su personal médico o paramédico en el ámbito de sus funciones. Para ello, nos fundamentamos en la doctrina de responsabilidad vicaria, decretada en el Art. 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5142. Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484, 512 (2009); Márquez Vega v. Martínez Rosado, supra, pág. 405.
Luego, resolvimos que los hospitales también responden por políticas institucionales que obstaculicen el cuidado de los pacientes. Véanse: Núñez v. Cintrón, 115 D.P.R. 598 (1984); Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984). Asimismo, hemos sostenido que los hospitales responden por los daños ocasionados por no tener disponible el equipo básico necesario para atender situaciones previsibles o por tenerlo en estado obsoleto o deficiente. Blás v. Hosp. Guadalupe, 146 D.P.R. 267, 323-327 (1998). En caso de que la responsabilidad del hospital concurra con la responsabilidad del médico, la responsabilidad del primero es solidaria con el segundo sin menoscabo de la determinación de los grados exactos de culpa en la relación interna entre ambos, para obtener rembolso directo en proporción a esa responsabilidad. Núñez v. Cintrón, supra, pág. 606.
Por otra parte, también hemos concluido que los hospitales responden por los médicos, dependiendo de la *289 relación jurídica que estos tengan con el hospital. Primero, los hospitales responden vicariamente por los médicos que son sus empleados. Márquez Vega v. Martínez Rosado, supra. Segundo, el hospital es responsable vicariamente por los actos negligentes de los médicos que, aunque no son sus empleados, son parte de su facultad (staff) y están dis-ponibles para consultas de otros médicos. íd., pág. 407; Núñez v. Ontrón, supra, pág. 606. Tercero, los hospitales responden conjuntamente con los concesionarios de fran-quicias exclusivas para prestar servicios en el hospital cuando cometen actos de impericia médica. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, págs. 515 y 516. Son ejemplos de estos concesionarios los anestesiólogos, radió-logos y proveedores de servicios de sala de emergencia. íd. Respecto a estos, el hospital es responsable por haber se-leccionado a ese personal y tenerlo ofreciendo servicios a los pacientes. íd.
Como última categoría, tenemos a los médicos que, sin ser empleados del hospital, gozan del privilegio de usar las instalaciones del hospital para recluir a sus pacientes privados. Al respecto, hemos impuesto responsabilidad a los hospitales por los actos de impericia médica cometidos por estos médicos, dependiendo de una distinción: si el hospital le asignó el paciente a ese médico no empleado o si se trata de un paciente privado del médico no empleado. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 513; Márquez Vega v. Martínez Rosado, supra, págs. 402-405.
Por un lado, si la persona acudió directamente al hospital en busca de ayuda médica y este le proveyó al paciente los facultativos médicos que lo atendieron, aplica la doc-trina de autoridad aparente. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra; Márquez Vega v. Martínez Rosado, supra. En ese caso, el hospital responderá vicaria y solida-riamente con el médico responsable del acto de impericia, *290 sin importar que este último sea un empleado del hospital, o uno a quien el hospital le haya concedido una franquicia para brindar servicios médicos especializados a los pacien-tes del mismo, o uno que es miembro de la facultad (staff) del hospital y a quien este llama en consulta para atender al paciente. Id.
En Márquez Vega v. Martínez Rosado, supra, aplicamos esta doctrina a una situación de hechos en que la víctima de impericia médica era una paciente privada del médico no empleado del hospital, que tenía el privilegio de recluir en esa institución a sus pacientes privados. En ese caso, no hubo alegación sobre actos negligentes de empleados del hospital ni se alegó que la institución fue negligente al concederle y mantenerle el privilegio al doctor imperito. Tampoco se alegó que las instalaciones y el equipo del hospital tuvieran relación con el acto de impericia. Por ello, no le impusimos responsabilidad al hospital y desestimamos el caso en su contra.
B. Acuerdo transaccional para liberar a uno o varios cocau-santes del daño
Una vez se impone responsabilidad solidaria entre un hospital y los médicos que incurrieron en impericia, la víctima puede otorgar un contrato de transacción, ya sea con uno de los codemandados, con varios o con todos. La transacción es un acuerdo mediante el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la prolongación de un pleito o ponen término al que ya había comenzado. Art. 1709 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4821.
Hemos expresado que los elementos que constituyen un acuerdo transaccional son: (1) una relación jurídica incierta litigiosa; (2) la intención de los contratantes de componer el litigio y sustituir la relación dudosa por otra cierta e incontestable, y (3) las recíprocas concesiones de *291 las partes. Con relación a este último elemento, se requiere que cada uno de los contratantes reduzca y sacrifique a favor de otro una parte de sus exigencias a cambio de reci-bir una parte de aquello que es objeto del litigio. Mun. de San Juan v. Prof. Research, 171 D.P.R. 219, 239 (2007); Ñeca Mortg. Corp. v. A & W Dev. S.E., 137 D.P.R. 860, 870 (1995).
Asimismo, hemos establecido que, al interpretar un contrato de transacción, aplican las normas generales sobre la interpretación de contratos en lo que no sean incompatibles con una norma particular de interpretación. En específico, aplican las normas decretadas sobre la necesidad de descubrir la verdadera intención de los contratantes cuando esta no surge claramente de los términos del contrato. Sucn. Román v. Shelga Corp., 111 D.P.R. 782, 789 (1981); Merle v. West Bend Co., 97 D.P.R. 403, 409-411 (1969).
En el contexto de responsabilidad extracontractual y solidaridad legal, expresamos recientemente que el que una víctima libere de responsabilidad a uno de los codemandados mediante un acuerdo transaccional no necesariamente significa que relevó a los otros codemandados, si esto último no está dispuesto claramente en el acuerdo. Por lo tanto, la víctima podría continuar su reclamación contra los demás codemandados. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra; US Fire Insurance v. A.E.E., 174 D.P.R. 846, 855 (2008).
Asimismo, hemos resuelto que los efectos de este tipo de contrato transaccional dependen de lo pactado entre las partes, en lo que respecta a la relación interna entre code-mandados solidarios y la relación externa entre codeman-dados y demandantes. Lo decisivo es la intención de las partes sobre los efectos de la transacción. Así, cuando surge claramente del acuerdo transaccional que el deman-dante libera a un codemandado de toda responsabilidad *292 que pueda surgir del evento que causó el daño, se enten-derá que ese codemandado ha sido liberado ante el deman-dante (relación externa) y ante los demás codemandados (relación interna). En ese caso, el demandante asumirá el grado de responsabilidad que el tribunal finalmente atri-buya al codemandado liberado. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra; Blás v. Hospital Guadalupe, 167 D.P.R. 439, 450-453 (2006); S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 655-656 (2003).
Por su parte, los demás cocausantes no liberados solo responderán por el porcentaje de responsabilidad que quede luego de restar el monto correspondiente a la por-ción de responsabilidad del cocausante liberado, y no por el monto de la indemnización. A su vez, esto significa que el resto de los cocausantes no pueden instar la acción de ni-velación en contra del cocausante que fue liberado de responsabilidad. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra; US Fire Insurance v. A.E.E., supra.
En cierta medida, ambas partes asumen un riesgo en este tipo de acuerdo transaccional. Por un lado, el deman-dante asume el riesgo de que el monto correspondiente a la porción de responsabilidad del cocausante liberado sea mayor a lo recibido a cambio del relevo de responsabilidad. Por otro lado, el cocausante liberado asume el riesgo de que el monto correspondiente a su porción de responsabili-dad sea menor a lo pagado a cambio de su exoneración. Además, si al cocausante liberado no lo hallan responsable, no tendrá derecho a recobrar lo que pagó. Los cocausantes no liberados tampoco podrán exigir que se les descuente lo lo que pagó el cocausante liberado, pero hallado no responsable. En este caso, el demandante percibe la ganancia. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra.
Por otro lado, el contrato transaccional puede liberar a un cocausante solo en la relación externa, sin relevarle de la responsabilidad que pueda tener con los demás *293 cocausantes en la relación interna. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra. Esto tendrá el efecto de reducir del monto de la sentencia la cantidad obtenida mediante la transacción, pero no se reducirá la cantidad equivalente al grado de responsabilidad del cocausante liberado. íd. Así, el demandante podrá reclamar a cualquiera de los demás cocausantes la cantidad restante del monto correspon-diente a la indemnización que otorgó el tribunal, sin tener que restar el monto equivalente al grado de responsabili-dad adjudicado al codemandado liberado. Consecuente-mente, el demandante no podrá recobrar el monto de la sentencia más la cantidad obtenida mediante la transacción. Respecto a la relación interna, los cocausantes no liberados podrían instar una acción de nivelación en contra del cocausante que fue liberado solo en la relación externa. Íd.; US Fire Insurance v. A.E.E., supra; Blás v. Hospital Guadalupe, supra.
En cuanto al grado de responsabilidad entre cocausantes, hemos establecido que el juez sentenciador deberá fijarlo al dictar sentencia. Si no lo hace, aplicará la presunción de igualdad de culpas. Sánchez Rodríguez v. López Jiménez, 118 D.P.R. 701, 707-708 (1987). No obstante, cuando se libera de responsabilidad a un cocausante mediante un acuerdo de transacción en medio de una acción en daños y peijuicios, antes de que se dicte sentencia, el foro primario deberá determinar en su sentencia el monto líquido total de los daños ocasionados a la víctima por todos sus cocausantes y deducirá del monto total el porcentaje de responsabilidad del codemandado liberado. S.L.G. Szendrey v. Hospicare, Inc., supra, págs. 658-659.
Asimismo, el foro primario deberá determinar el grado de responsabilidad de cada uno de los cocausantes no libe-rados de responsabilidad, para efectos de la nivelación posterior entre ellos. S.L.G. Szendrey v. Hospicare Inc., supra, págs. 658-659. De no ser así, existiría como alternativa la *294 acción independiente de nivelación. Soc. de Gananciales v. Soc. de Gananciales, 109 D.P.R. 279, 282-283 (1979).
C. Cosa juzgada
Por otra parte, la doctrina de cosa juzgada, decretada en el Art. 1204 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3343, impide que, luego de emitida una sentencia en un pleito anterior, las mismas partes relitiguen en un pleito posterior iguales causas de acción y cosas, las controversias ya litigadas y adjudicadas, y aquellas que pudieron haber litigado. Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 769 (2003); Acevedo v. Western Digital Caribe, Inc., 140 D.P.R. 452, 464 (1996). Para que se active la presunción de cosa juzgada en otro juicio, se requiere que entre el caso resuelto mediante sentencia y el caso en que esta se invoca concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad en que lo fueron. 31 L.P.R.A. sec. 3343. Véanse, también: Méndez v. Fundación, 165 D.P.R. 253, 267 (2005); Pagán Hernández v. U.P.R., 107 D.P.R. 720, 732 (1978).
La doctrina de cosa juzgada se fundamenta en consideraciones de orden público y necesidad. Por un lado, vela por el interés gubernamental en que se finalicen los pleitos. También, busca dar la debida dignidad a los fallos de los tribunales. Por otro lado, se interesa en no someter a los ciudadanos a las molestias de tener que litigar dos veces una misma causa. Rodríguez Rodríguez v. Colberg Comas, 131 D.P.R. 212, 218-219 (1992); Pérez v. Bauzá, 83 D.P.R. 220, 225 (1961). No obstante, la aplicación de la doctrina de cosa juzgada no procede de forma inflexible y automática cuando hacerlo derrotaría los propósitos de la justicia o las consideraciones de orden público. Parrilla v. Rodríguez, 163 D.P.R. 263, 269 (2004).
*295 III
A. Responsabilidad de los hospitales para con los pacientes
El foro de primera instancia determinó, en reconsidera-ción, que HIMA era responsable solidariamente por los ac-tos de los médicos codemandados. Esta determinación sur-gió como resultado del planteamiento que las demandantes hicieron al amparo de la doctrina de autoridad aparente, en su moción de reconsideración.
Con relación a los doctores Tirado Menéndez y Santana, surge del expediente que no son empleados de HIMA. Al doctor Tirado Menéndez lo contrató la corporación que ad-ministra la Sala de Emergencia de HIMA y el doctor Santana tenía privilegios para atender a sus pacientes priva-dos en HIMA. Al ser así, debemos determinar si HIMA es responsable vicaria y solidariamente por los actos de impe-ricia de ambos, al amparo de la doctrina de autoridad aparente.
Surge del expediente que la Sra. Iris Fonseca acudió al Hospital a través de la Sala de Emergencia, sin ser previa-mente una paciente privada de los galenos codemandados. Asimismo, surge que la Sra. Iris Fonseca era paciente de otro hospital y que fue llevada a HIMA por ser el hospital más cercano. Allí, HIMA le proveyó los servicios de ambos galenos. Siendo así, conforme a la doctrina de autoridad aparente, HIMA responde vicaria y solidariamente junto a los doctores codemandados.
Nos queda considerar si se le impuso a HIMA responsa-bilidad directa por su negligencia propia. Como dijimos an-teriormente, este tipo de responsabilidad se puede imponer cuando el hospital no fue cuidadoso al conceder y mantener el privilegio a médicos no empleados para recluir a sus pacientes privados en las instalaciones hospitalarias, cuando no cuenta con el equipo necesario para atender si-tuaciones previsibles o lo tiene en estado defectuoso, o *296 cuando implementa políticas administrativas que obstacu-lizan la provisión de servicios médicos. Al respecto, el Tribunal de Primera Instancia no impuso en su sentencia res-ponsabilidad a HIMA por sus propios actos.
Respecto a la resolución certificada en 2009, esta se li-mitó a reiterar la doctrina de responsabilidad corporativa que impone la solidaridad a los Hospitales por su propia negligencia. Al respecto, señaló que las demandantes nunca presentaron evidencia de negligencia por parte de HIMA al supervisar a los médicos codemandados o con re-lación a actos previos de impericia médica de estos. Por último, recordó que había concluido en la sentencia que advino final y firme que HIMA no tenía responsabilidad porque sus empleados actuaron de acuerdo con las direc-trices de los doctores Tirado y Santana. Así, denegó la so-licitud de embargo que presentaron las demandantes.
Por otra parte, no surge evidencia, ni de las determina-ciones de hecho del foro primario ni del expediente, rela-cionada con negligencia independiente de HIMA, falta de equipo necesario o implantación de políticas administrati-vas que obstaculizaran el servicio médico. Consecuente-mente, el foro primario no le impuso a HIMA responsabili-dad directa, ya que no incurrió en negligencia propia.
Por todo lo anterior, es forzoso concluir que el foro de primera instancia solo impuso a HIMA responsabilidad vi-caria por los actos imperitos de los galenos codemandados. Por ello, no procedía imponerle grado de responsabilidad por actos independientes de negligencia.
Habiendo concluido esto, debemos determinar si el acuerdo transaccional liberó de responsabilidad a HIMA.
B. Acuerdo transaccional para liberar a uno o varios cocau-santes del daño
Las demandantes suscribieron el contrato de transac-ción para liberar de toda responsabilidad a los doctores Tirado Menéndez y Santana, así como a S.I.M.E.D. Con- *297 forme a ello, en el inciso seis (6) del acuerdo transaccional, las demandantes los relevaron de responsabilidad
... por cualquier obligación que pudiese imponerse a ellos por los daños alegados o no, que surjan del evento que propició la presentación de la demanda. Bajo ningún concepto, las partes comparecientes pagarán cantidad alguna adicional a las espe-cificadas en este documento. (Énfasis suplido.) Apéndice del Certiorari, pág. 104.
Consiguientemente, la parte demandante dio por termi-nado el caso en cuanto a los doctores Tirado Menéndez y Santana, así como a S.I.M.E.D.
Al analizar este acuerdo de transacción, concluimos que la parte demandante los liberó de responsabilidad, tanto en la relación externa como en lo que respecta a HIMA en la relación interna. El texto del referido inciso seis (6) uti-liza un lenguaje abarcador y extensivo cuando describe las obligaciones por las cuales libera a los médicos codemandados. De la misma manera, este inciso usa un lenguaje que excluye absolutamente la posibilidad de que los codemandados liberados paguen alguna cantidad adicional. Además, el inciso (7) establece que HIMA no será responsable de forma alguna por los daños causados por los doctores codemandados. Esto refuerza nuestra conclu-sión de que las demandantes liberaron a los médicos code-mandados, tanto en la relación externa como en la interna. Así, las demandantes se subrogaron en el lugar de los co-causantes liberados y asumieron su grado de responsa-bilidad.
En cuanto a HIMA, la parte demandante se reservó el derecho de continuar el trámite de ejecución de sentencia en su contra. Sin embargo, aclaró en el inciso siete (7) del acuerdo que
HIMA, el cual queda en el pleito y contra quien prosiguen los trámites post-sentencia, no será responsable de forma al-guna por los daños que pudieran ser atribuibles a y/o hayan sido causados por los co-demandados comparecientes. ... *298 HIMA sólo responderá a la parte demandante por los daños causados por sus propias acciones u omisiones negligentes, las acciones u omisiones negligentes de sus empleados y/o de aque-llas personas por las cuales deba responder bajo cualquier doc-trina legal vigente en Puerto Rico, o por la participación que en su momento se establezca compete a HIMA pagar según la sentencia emitida por el Tribunal de Primera Instancia. (Én-fasis suplido.) Apéndice del Certiorari, págs. 104-105.
Al respecto, debemos tener presente que el Tribunal de Primera Instancia, en su resolución del 2007, determinó que HIMA era responsable solidariamente “por las actua-ciones de los médicos autorizados a prestar servicios profe-sionales en el Hospital”. Esto, luego de haber resuelto me-diante sentencia que la muerte de la Sra. Iris Fonseca se debió a la impericia médica de los doctores Tirado Menén-dez y Santana. Fue precisamente en cuanto a los actos negligentes de los galenos codemandados que el inciso (7) del acuerdo transaccional estipuló que HIMA no será responsable.
Ahora bien, las demandantes sí se reservaron la facul-tad de proseguir el pleito contra HIMA por los daños cau-sados por sus propias acciones u omisiones negligentes o por las acciones u omisiones negligentes de sus empleados. No obstante, nunca se ofreció prueba de que HIMA o sus empleados incurrieron en acciones u omisiones negli-gentes.
El foro primario resolvió que las enfermeras y el personal del Hospital siguieron las instrucciones de los médicos, por lo que HIMA no respondía vicariamente por sus actos u omisiones negligentes. Asimismo, en la resolución del 2009, el foro de instancia encontró que no se presentó evi-dencia en cuanto a si hubo o no supervisión por parte de los facultativos médicos, empleados de HIMA, de los doctores Tirado Menéndez y Santana. Tampoco se presentó eviden-cia sobre actos previos de impericia profesional de esos doctores. Así, pues, el foro primario concluyó nuevamente que HIMA no tenía responsabilidad porque sus empleados *299 actuaron según las directrices de los doctores Tirado Me-néndez y Santana. Por lo tanto, el tribunal sentenciador fue consecuente al determinar que HIMA no incurrió en negligencia, independiente de la negligencia de los médicos codemandados. Por su parte, las demandantes tampoco nos han puesto en posición de determinar que HIMA incu-rrió en negligencia independiente a la de los médicos codemandados.
Al aplicar el acuerdo transaccional a estos hechos, ve-mos que las demandantes liberaron de toda responsabili-dad a los médicos codemandados por la muerte de la Sra. Iris Fonseca, tanto en la relación externa frente a las de-mandantes como en la relación interna frente a HIMA. Al ser así, las demandantes subrogaron el lugar de los code-mandados liberados y asumieron toda la responsabilidad que se les adjudicó. Respecto a HIMA, las demandantes se reservaron la facultad de proseguir la acción en su contra, pero únicamente por la negligencia propia de HIMA o de sus empleados, independiente de la negligencia de los mé-dicos codemandados. Como discutimos anteriormente, el foro de instancia no le adjudicó grado de responsabilidad a HIMA ni encontró que hubiera incurrido en negligencia. Al contrario, le impuso responsabilidad solidaria solo por los actos negligentes de los médicos codemandados. Como a estos últimos los relevaron de toda responsabilidad, nos vemos forzados a concluir que las demandantes también relevaron a HIMA, pues este era responsable solidaria-mente solo por los actos negligentes de los médicos code-mandados y no incurrió en negligencia propia.
Habiendo resuelto lo anterior, nos corresponde determi-nar si el Tribunal de Apelaciones erró al aplicar la doctrina de cosa juzgada a este caso.
C. Cosa juzgada
El foro primario no impuso responsabilidad a HIMA. Luego, el foro de primera instancia determinó en reconsi-deración que HIMA era solidaria y vicariamente responsa- *300 ble por las actuaciones de los médicos autorizados a pres-tar servicios profesionales en el Hospital. Ello, al amparo de la doctrina de autoridad aparente. Esa determinación de solidaridad se tornó final y firme.
Luego, en la resolución del 2009, el foro primario denegó la solicitud de embargo contra HIMA. En esta resolución, se limitó a discutir someramente la responsabilidad solida-ria de los hospitales por sus propias acciones. La resolución no discutió la responsabilidad de los hospitales al amparo de la doctrina de autoridad aparente. En su parte exposi-tiva, señaló que nunca se presentó evidencia de negligencia propia por parte de HIMA. Así, denegó el embargo solicitado. Para esta determinación, el Tribunal de Pri-mera Instancia tuvo ante su consideración el acuerdo transaccional. Asimismo, HIMA alegó en oposición al embargo que, aunque se le impuso responsabilidad solidaria junto a los doctores codemandados, no fue cocausante de los daños ocasionados a las demandantes y no incurrió en negligencia propia.
Por lo tanto, al considerar los planteamientos de HIMA, el foro primario no reconsideró su imposición inicial de res-ponsabilidad solidaria a HIMA, al amparo de la autoridad aparente, sino que aplicó correctamente el acuerdo tran-saccional, según interpretado anteriormente. Es decir, el foro primario se limitó a recalcar que no se le impuso res-ponsabilidad a HIMA por sus actos propios, lo que significa que las demandantes no tienen una causa de acción contra HIMA como resultado de la liberación total de responsabi-lidad que hicieron a los únicos cocausantes del daño. Así, pues, concluimos que no aplica la doctrina de cosa juzgada a este caso, pues no se trata de la reconsideración de un asunto resuelto mediante dictamen final y firme. Lo con-trario sería un fracaso de la justicia, al imponerle respon-sabilidad adicional a un codemandado que ya fue liberado de responsabilidad por las demandantes mediante un acuerdo transaccional.
*301 IV
Por los fundamentos que anteceden, se revoca la senten-cia del Tribunal de Apelaciones y se reinstala la resolución recurrida del Tribunal de Primera Instancia que denegó un embargo contra HIMA.

Se dictará sentencia de conformidad.

Los Jueces Asociados Señores Rivera García y Feliberti Cintrón concurrieron sin opinión escrita.